**In re Curtis M. PERRY, a/k/a Curtis M. Perry, III d/b/a Curt Perry Contracting Co., Debtor.**

No. 98–21708–JNF.

United States Bankruptcy Court, D. Massachusetts.

Oct. 30, 2006.

Gary W. Cruickshank, Law Office of Gary W. Cruickshank, Boston, MA, Richard J. Cohen, Esq., P.C., Centerville, MA, for Debtor.

Andrew G. Lizotte, Charles R. Bennett, Jr., Harold B. Murphy, Hanify & King, P.C., Boston, MA, James Leshaw, Greenberg Taurig, Miami, FL, for Trustee.

## MEMORANDUM

JOAN N. FEENEY, Bankruptcy Judge.

## I. INTRODUCTION

The matter before the Court is the Objection of Debtor to Proof of Claim of Glenn W. Machado (the "Machado Claim").[1] By way of background, Curtis M. Perry ("Perry" or the "Debtor") filed a Chapter 11 petition on December 4, 1998. His Chapter 11 case was converted to a case under Chapter 7 on February 19, 1999. The Debtor did not list Glenn W. Machado ("Machado") as a creditor on his Schedules. Machado filed his proof of claim on October 12, 2001 in the amount of $18,585.33. The Debtor filed his Objection to the proof of claim on December 4, 2002 along with multiple exhibits and filed a Supplemental Objection to the Machado Claim on December 27, 2002. On January 22, 2003, Machado filed an Opposition to the Debtor's Objection to his claim.

The Court initially heard the Debtor's Objection to the Machado Claim on April 20, 2004 and took under advisement the issue of whether the applicable statute of limitations barred Machado's claim. The

---

1. Pursuant to a Settlement Agreement by and among the Chapter 7 Trustee of the estate of the Debtor, Curtis Perry, Curtis Perry and Isabel Perry, Individually and as Trustee of Casa Sol Realty Trust, Crimson Realty Trust and MAP Realty Trust, the Chapter 7 Trustee authorized the Debtor to object to the proof of claim filed by Machado. The parties agreed that "[i]f the Machado Claim is allowed by this Court, Isabel agrees to pay same within thirty (30) days of the allowance of the final order of this Court approving the Settlement Agreement or allowing the Machado Claim, whichever is later." Machado did not object to the Motion of Chapter 7 Trustee for Author-ity to Compromise Controversy with Debtor and Isabel Perry, Individually and as Trustee of Case [sic] Sol Realty Trust, Crimson Realty Trust and MAP Realty Trust, which motion incorporated the terms of the Settlement Agreement. On April 29, 2003, this Court approved the Settlement Agreement and entered an order granting the Motion for Authority to Compromise Controversy with Debtor and Isabel Perry, Individually and as Trustee of Case [sic] Sol Realty Trust, Crimson Realty Trust and MAP Realty Trust, thus giving the Debtor standing to object to the Machado Claim.

Court, citing the dissenting opinion in *Solomon v. Birger*, 19 Mass.App.Ct. 634, 477 N.E.2d 137 (1985), subsequently ruled that Machado was barred from asserting a claim for fraud, but was not precluded from asserting a claim for breach of contract because under either the six year statute of limitations applicable to contracts, *see* Mass. Gen. Laws Ch. 260, § 2, or the twenty year statute of limitations applicable to contracts under seal, *Id.* at § 1, his claim would not be barred.[2]

The Court conducted a three-day trial with respect to the Debtor's Objection to the Machado Claim. At the trial, Machado, who represented himself, and Perry testified, and 33 exhibits were submitted in evidence. The issues presented include whether Machado satisfied his burden of proving breach of the Purchase and Sale Agreement, which was the basis of his proof of claim, as well as the amount of damages resulting from breach of that Agreement.

The Court now makes the following findings of fact and conclusions of law in accordance with Fed. R. Bankr.P. 7052.

## II. FACTS

### A. *The Evidence*

In January of 1993, the Debtor and Machado agreed that Machado would purchase a two-family residence owned by the Debtor and located at 121 Shawmut Avenue, New Bedford, Massachusetts (the "Property"). The Property was occupied by tenants who qualified for subsidized housing, and, therefore, it was periodically inspected by the New Bedford Department of Health's Division of Minimum Housing Standards. The parties, both of whom are experienced real estate professionals,[3] executed a Purchase and Sale Agreement sometime in early January 1993. The Purchase and Sale Agreement contained the following typed and partially hand written provisions:

> The Buyer acknowledges that he has not been influenced to enter into this transaction nor has he relied upon any warranties or representation not set forth or incorporated in this agreement or previously made in writing except for the following additional warranties and representations, if any, made by either the Seller or the Broker: Both units are approved by Section 8 and 707 Funding Authorities of New Bedford and are free of any and all Min. housing violations including free of all lead paint and asbestos in the and on the [sic] entire property. Certificate of lead free and asbestos are assured by the Seller and Certificates stating the same by city and state authorities and in possession of

---

**2.** In *Solomon v. Birger*, 19 Mass.App.Ct. 634, 477 N.E.2d 137 (1985), the dissenting judge observed:

> Promises concerning title and possession are essential to any conveyance, and consequently they are merged into the accepted deed. On the other hand, promises that do not concern title or possession are collateral to the main agreement to convey and may be deemed not to have been merged into the deed. The warranty language expressed in § 9 of the purchase and sale agreement does not relate to title or possession—that is, it neither clouds the title nor

> prevents possession of the property. The warranty concerns the question of habitability. A promise that a house is suitable for habitation has been held not to merge into the deed.

> 19 Mass.App.Ct. at 646, 477 N.E.2d 137 (citations omitted, footnote omitted).

**3.** Machado has held a real estate broker's license since 1975 and has owned several investment properties in New Bedford. Perry also owned investment properties in New Bedford and was a licensed deleading contractor as well as a Master Lead Paint Inspector.

Seller and must be given to Buyer on or before closing.

Additionally, the Purchase and Sale Agreement provided: "This contract shall bind and enure to the benefit of the parties and their respective legal representatives, heirs, successors and assigns. This agreement is intended to take effect as a sealed instrument." The Debtor transferred the Property to Machado by Quitclaim Deed recorded at the Bristol County Registry of Deeds on March 23, 1993 for a stated purchase price of $90,000, although the Purchase and Sale Agreement set forth a purchase price of $105,000, and Machado assumed the existing mortgage on the property. Neither the Purchase and Sale Agreement nor the Quitclaim Deed contained any language stating that acceptance of the deed would constitute full performance of the contract. Although the Purchase and Sale Agreement permitted Machado to obtain a home inspection at his own expense and to terminate the Purchase and Sale Agreement if he were not satisfied with the inspection report, Machado did not avail himself of the opportunity to have the Property inspected.

Prior to Machado's acquisition of the Property, Perry had been cited by the New Bedford Department of Health, Division of Minimum Housing Standards on at least five occasions. On September 4, 1991, Inspector William Rolli prepared Violation Order No. 18022, finding 14 violations. Perry was ordered to refinish ceilings and repair windows within 30 days and to perform other repairs to the plumbing and entrance ways within 24 hours. Approximately one year later, Inspector Rolli prepared Violation Order No. 18369 with respect to a broken sewer pipe and sewage in the basement of the Property, violations which required immediate cor-

rection. Approximately one month later, on October 8, 1992, Inspector Ann Gagne prepared two Violation Orders, one (No. 183410) for the first floor apartment, and the other (No. 183411) for the second floor apartment. She found numerous violations, including problems with the walls, ceilings, windows, and screens, as well as a lack of heat in radiators. Violation Order No. 183410 included the following corrective actions for the first floor apartment: provide heat in the radiators where needed; repair or replace defective light fixture in ceiling in front bedroom; repair entire walls in bathroom; repair leaking under washbasin; repair entire ceilings in bathroom; remove all mildew from bathroom. It included the following corrective actions for the second floor: provide heat in defective radiators where needed in all rooms and repair or replace cooking stove. Violation Order No. 183410, a certified copy of which was submitted by Machado contains the date stamp of December 10, 1992 as the date on which Perry complied with the order. Similarly, Violation Order No. 183411, which required Perry to repair lighting in the bathroom ceiling of the second floor apartment, as well as to repair a cabinet door under kitchen sink, repair windows to open and close properly in all rooms where needed, repair screens where needed, and repair screens in the rear hall way, showed the same December 10, 1992 date stamp for compliance.

On January 26, 1993, at around the time Perry and Machado executed the Purchase and Sale Agreement, Inspector Ann Gagne again inspected the Property and prepared Violation Order No. 18503, finding five violations, including problems with the walls and ceilings in the first floor unit presumably from leaks from the second floor unit.[4] Perry testified that the tenant in

---

4. Specifically, Inspector Ann Gagne ordered

the following corrective action for the first

the second floor unit improperly used her washing machine and routinely flooded the bathroom of her apartment and causing damage to the ceilings and walls of the apartment below.

Prior to Machado's acquisition of the Property, Perry also had been served with criminal complaints with respect to the condition of the Property. In October of 1991, he was cited for failing to notify the proper authorities with respect to a repair associated with a furnace covered with asbestos, some of which was "torn, exposed, ... [and] ... deteriorating ... in several places" as well as failing to notify the department about the problem and "complete form [sic]." In November of 1991, the Department of Health filed a complaint against him with respect to cockroach infestation, bees in the eaves of the Property, and the presence of garbage and discarded furniture in the rear yard.

With respect to problems with lead paint on both exterior and interior surfaces, on April 24, 1991, John Walsh ("Walsh"), DPH Registration Number M1174, of Plymouth County Homes, Inc. prepared a Lead Paint Report. On May 11, 1991, Gerald Huston ("Huston") of Huston Deleading Company prepared two abatement compliance invoices for the Property. The invoices for the first and second floor units are in the amount of $2,500.00 and $25,000.00, respectively. Perry did not submit evidence that either invoice was paid or evidence that the invoices were in the correct amounts. Moreover, Perry

and Huston at one time were in the deleading business together.

On the same day that Huston submitted his invoices to Perry, Walsh of Plymouth County Homes, Inc. prepared two Letters of Lead Abatement Compliance, certifying that he had inspected the apartments at 21 Shawmut Avenue and determined that the surfaces cited in the initial inspection report of April 24, 1991 "were found to be in compliance with Massachusetts General Laws, Chapter 111, Section 197, and CMR 460.000 Regulations for Lead Poisoning Prevention and Control."[5]

Approximately 18 months later, on September 15, 1992, Inspector William Rolli visited the Property at 21 Shawmut Avenue and determined that dangerous levels of lead paint were present in four locations both inside and outside the Property. He identified the existence of lead paint in the "window parting bead/exterior sill" in the kitchen and in one bedroom and in the "window casing" in another bedroom. Additionally he identified flaking lead paint on the exterior. As a result, Perry was notified that he was required to provide the City of New Bedford's Department of Health with a written contract with a licensed deleader to abate all the lead violations within 60 days. The Department also required him to provide the deleading contractor with a complete inspection report from a licensed lead paint inspector. It further notified him of the following:

---

floor: provide faucet for bathtub; repair leak under washbasin, repair leak in ceilings in kitchen and bathroom, repair mildew stained walls above bathtub, and provide a separate thermostat. Machado's exhibit does not reflect a date that Perry complied with this order.

**5.** The letters contains the additional language as follows:

Massachusetts law does not require the abatement of all residential lead paint. The residential premises or dwelling unit and relevant common areas shall remain in compliance only as long as there continues to be no peeling, chipping or flaking lead paint or other accessible leaded materials and as long as coverings forming an effective barrier over such paint or other leaded materials remain in place....

The contractor must provide written notification to the Department of Labor and Industries, all residential occupants, the Board of health and the state Child Lead Poisoning Prevention Program (CLPPP) at least five days before any deleading work begins. It is your responsibility, as the owner of the premises, to make sure that the contractor sends the completed forms to all parties. All occupants and pets must be out of the dwelling unit for the entire time that interior deleading work is in progress. They may not return until a licensed private inspector approves reoccupancy by conducting an on-site reinspection of the unit; this will be done after the final deleading clean-up. Deleaded surfaces are not to be repainted until after the inspector gives approval.

\* \* \*

You are required to provide written notice of the presence of lead paint to all other occupants of the building. "Notice to Tenants of Lead Paint Hazards" is enclosed for that purpose.

You are also required to send a copy of the inspection report and the enclosed order to all mortgagees and lienholders of record.

On the same day, the Department of Health also issued an "Order to Correct Violation" to Perry with respect to the lead paint violations found on September 15, 1992. Perry submitted a Letter of Lead Abatement Compliance signed by Huston on December 10, 1992 for apartment 2 only. Huston stated that "those surfaces cited in the initial inspection report of 5–

11–91 were found to be in compliance with Massachusetts General Laws, Chapter 111, Section 197, and 105 CMR 460.000 Regulations for Lead Poisoning prevention and Control."

As noted above, Machado acquired the property by Quitclaim Deed, which was recorded on March 23, 1993. Although the Purchase and Sale Agreement provided that "Certificate of lead free and asbestos are assured by the Seller and Certificates stating the same by city and state authorities and in possession of Seller and must be given to Buyer on or before closing," Machado did not testify or produce evidence that Perry gave him certificates stating that the Property was actually free of lead paint and asbestos.

Machado testified that, although the Property was occupied by tenants when he acquired it, he never collected rent from one tenant and "there was always an issue getting anything from the tenants." He stated that he collected rent for awhile but after the Department of Health inspectors determined that there were sanitary code violations "the people stopped payment."

Following his acquisition of the property in the spring of 1993,[6] Machdo was soon notified of sanitary code violations by the Department of Health. On May 25, 1993, Inspector Ann Gagne, together with Inspector Renee A. Stevens, prepared Violation Order No. 18643, finding 11 violations, including stained ceilings, broken and hard to open windows, missing window screens and plumbing problems.[7] Approximately one month later, on June 21, 1993, Inspectors Gagne and Stevens prepared Violation Order 18865 finding 18 violations, includ-

**6.** The Quitclaim Deed was recorded on March 23, 1993.

**7.** Specifically, the corrective actions required included repairing stained ceiling in pantry, repairing window in living room to be able to stay open, repairing windows in front bedroom to open and close properly, repairing

broken window pane in front bedroom, replacing missing window screens for all windows, providing proper lighting in front hallway, repairing or replacing broken cellar stair tread, repairing bathroom sink, securing wash basin in bathroom to wall, repairing ceiling stains, repairing defective light fixture in bedroom. The inspector ordered the last

ing problems with the ceilings and walls, broken windows, and torn and missing window screens.[8] These violations were confined to the first floor apartment and common areas. As a result of a follow-up investigation, the Department of Health's Division of Minimum Housing Standards sent Machado a letter dated July 29, 1993, in which it stated that the first floor apartment was vacant and notified him that the apartment could not be "rented or occupied until all violations are abated and written permission to rent or occupy has been obtained from this office." As was the case with Perry, the Department of Health filed criminal complaints against Machado with respect to the outstanding sanitary code violations.

On September 22, 1993, Inspector Ann Gagne prepared two Violation Orders. Pursuant to Violation Order No. 18985, she determined that Machado, on an emergency basis, was required to "[p]rovide heat in every habitable room for 2nd floor." Pursuant to Violation Order No. 18986, she reported 21 violations, noting the need to repair walls, windows and stair treads.[9] The Health Department of the City of New Bedford filed a criminal complaint against Machado with respect to Violation Order Nos. 18985 and 18986. Prior to filing the Complaint, Inspector Gagne hand delivered the Violations Orders and

attempted to meet with Machado on September 28, 1993. On October 19, 1993, she reported that she met Machado at the Housing Court and "Mr. Machado agreed to put the tenant up in a Hotel why [sic] he was complying with the violations. He also agreed to give the tenant heat. He will call the Office when the violations are corrected so I could recheck them to give the tenant OK to move back into the apt." In subsequent reports, Inspector Gagne reported that she went to Housing Court on November 5, 1993 at which time "Mr. Machado was fined. To pay lawyer's expense and 500.00 to the tenant for moving expenses." On January 14, 1994, she reported that the complaint filed with the Housing Court with respect to the various sanitary code violations "was dismissed against the owner as long as he keeps the property vacant."

On the same day that Inspector Gagne prepared Violation Order Nos. 18985 and 18986, she made a lead paint determination, finding lead paint in the kitchen ("window parting bead/exterior sill") of the second floor apartment, as well as on the exterior of the building, where she noted flaking paint and lead paint at the entry door or door casing. By letter dated September 22, 1993, the Department of Health, Division of Minimum Housing Standards notified Machado as to his re-

---

four corrective actions to be completed within 24 hours.

8. Specifically, the corrective actions required included repairing stained ceiling in the kitchen, securing top wood on kitchen cabinet, repairing ceiling from peeling in right front bedroom, repairing wall in right front bedroom, repairing entire ceiling and walls in bathroom, repairing bathroom floor around toilet and washbasin, securing door in left middle bedroom, providing window frame for left rear bedroom, replacing broken window pane in front bedroom, providing window screens for living room windows, repairing or replacing torn screens in left middle bed-

room, repairing or replacing screens in left rear bedroom, providing light for front hallway, providing door knob for front hallway, repairing holes in the wall of the front hallway, repairing or replacing broken cellar stair treads, and replacing missing window panes for rear exterior storm door.

9. Violation order No. 18986 pertained to the second floor apartment. The corrective action included making all windows fit properly in all rooms where needed and providing storm windows for all windows where needed. Machado was also ordered to repair walls and ceilings and replace broken window panes.

sponsibilities to "provide this office, within 60 (sixty) days of your receipt of this letter, a written contract with a licensed de-leader to abate all lead violations existing in the dwelling unit, including interior and exterior common areas," adding that he also was required to "provide the deleading contractor with a complete inspection report from a licensed lead paint inspector." [10]

Machado did not immediately comply with the provisions set forth in the September 22, 1993 letter. On May 31, 1994, approximately eight months after the lead determination made by Inspector Ann Gagne, Danial A. Greene, President of New England Lead Consultants, Inc. inspected the second floor apartment, which was vacant at the time. Machado testified that he failed to make mortgage payments because he was unable to collect rents due to vacancies at the Property. As noted, the first floor apartment was unoccupied before August of 1993, and Machado testified that the second floor tenant failed to pay rent beginning in June of 1993. The holder of the mortgage, which Machado had assumed in conjunction with his acquisition of the Property, conducted a foreclosure sale in December of 1994. Perry was the only bidder at the foreclosure sale and purchased the Property in the name of Casa Sol Realty Trust at a huge discount from the balance due on the mortgage. At around this time, the New Bedford Department of Health filed a criminal complaint against Machado noting that as of December 29, 1994 "the owner has not yet complied." The property was not deleaded in accordance with applicable regulations until well after the foreclosure sale.

### B. The Proof of Claim

Machado filed his proof of claim on October 15, 2001. He attached to the proof

---

**10.** The letter further provided:

The deleading contract must be signed by the contractor and by you; it must specify that all violations on the interior of the unit and the interior common areas will be deleaded within 90 (ninety) days of your receipt of this letter, and that all exterior violations and/or window replacement will be complete within 120 (one hundred and twenty) days.

This Department is required by law to file a case against you in court if it has not received a copy of the deleading contract by the sixty-first day, or if the above timelines for interior and exterior deleading compliance are not adhered to as documented by a private lead paint inspector. In a criminal case, you may be fined by the court up to $500 for each day of non-compliance. Only contractors licensed by the Department of Labor and Industries as deleading contractors may engage in the removal, covering, or replacement of lead hazards. Neither you nor anyone in your employ nor the occupants of this unit may remove or cover any lead paint unless that person is a licensed deleading contractor.

The contractor must provide written notification to the Department of Labor and In-

dustries, all residential occupants, the Board of health and the state Childhood Lead Poisoning Prevention Program (CLPPP) at least five days before any deleading work begins. It is your responsibility, as the owner of the premises, to make sure that the contractor sends the completed forms to all parties.

All occupants and pets must be out of the dwelling unit for the entire time that interior deleading work is in progress. They may not return until a licensed private inspector approves reoccupancy by conducting an on-site reinspection of the unit; this will be done after the final deleading clean-up. Deleaded surfaces are not to be repainted until after the inspector gives approval.

\* \* \*

You are required to provide written notice of the presence of lead paint to all other occupants of the building. "Notice to Tenants of Lead Paint Hazards" is enclosed for that purpose.

You are also required to send a copy of the inspection report and the enclosed order to all mortgagees and lienholders of record.

of claim the original Purchase and Sale Agreement. A so-called "Lead Paint Clause" appeared on the back of the Purchase and Sale Agreement. Although unsigned by either Machado or Perry, the clause provided the following:

"BUYER" acknowledges that SELLER has informed him that the premises described in this contract may be contaminated with dangerous levels of lead....

Additional documents attached to the proof of claim reveal that Machado, on June 16, 1993, conveyed the Property by Quitclaim Deed to the Middlesex Nominee Trust II for a stated consideration of "Love and Affection;" that Citizens Bank of Massachusetts, formerly Fairhaven Savings Bank, obtained an "Order Authorizing the Foreclosure of Real Estate Mortgage by Entry and Possession and Exercise of Power of Sale on July 20, 1994 with respect to the mortgage encumbering the Property in the original principal amount of $73,000"; and that Citizens Bank of Massachusetts conveyed the Property to Isabel N. Perry, Trustee of Casa Sol Realty Trust for $35,000 on or around December 19, 2004. Additionally, Machado attached to his proof of claim a letter dated August 2, 1993 from attorneys for Citizens Bank advising him that his mortgage had been turned over to them "for foreclose for non-payment of the principal, interest and taxes as provided in the note and mortgage which constitutes a default and breach of the terms of said note and mortgage...."

## III. POSITIONS OF THE PARTIES

### A. *Machado*

Machado argued that "the Debtor failed to deliver the property as warranted and knowingly and without excuse breached the contract." He added:

These representations, warranties and additional provisions were exceptions to the contract. The building was deemed completely uninhabitable and condemned within 6 months after the Claimant received title.... As a result the Claimant was not able to fulfill any of his mortgage obligations.... The Claimant has suffered damage of $35,000 ... and $18,5585.33 for a deficiency settlement. Claimant has spent $6000 in attorneys fees PLUS loss of equity and repair fees.[11]

### B. *The Debtor*

The Debtor denied the existence of any lead paint violations when Machado acquired the Property. He maintained that the language utilized in the Purchase and Sale Agreement merely expressed the fact that he had abated the lead paint violations discovered prior to Machado's acquisition of the Property. Moreover, he asserted that any representations about the condition of the Property were merged into the deed and Machado is barred from recovery any money for breach of contract as a result. According to the Debtor, if there were any lead paint problems at the Property when Machado owned it, the problems were caused by Machado's failure to maintain and heat the Property.

## IV. DISCUSSION

Pursuant to Fed. R. Bankr.P. 3001(f), "[a] proof of claim properly executed and filed in accordance with these rules shall constitute prima facie evidence of the va-

---

11. In a letter attached to his proof of claim drafted by his attorney, Machado asserted that he lost his equity in the Property in the sum of $17,000 and his deposit in the sum of $35,000 for a total of $52,000. Machado only sought $18,585.33 through his proof of claim.

lidity and amount of the claim." Pursuant to 11 U.S.C. § 502(a), "[a] claim ... proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest ... objects." If an objection is made, "the court, after notice and a hearing, shall determine the amount of such claim as of the date of the filing of the petition, and shall allow such claim in lawful currency of the United States in such amount...." *Id.* § 502(b). Based upon the evidence submitted, the Court finds that Machado has failed to sustain his burden of proof with respect to damages.

 Addressing the first issue, namely whether acceptance of the deed must be deemed full performance and discharge of the obligations under the Purchase and Sale Agreement, the Court finds that the Debtor's obligations were not merged into the deed. In *Albrecht v. Clifford*, 436 Mass. 706, 767 N.E.2d 42 (2002), the Supreme Judicial Court stated the general rule that "[a]cceptance of a deed ordinarily merges all obligations in the purchase and sale agreement, except for those specified in the deed itself." *Id.* at 716, 767 N.E.2d 42 (citing *McMahon v. M & D Bldrs., Inc.*, 360 Mass. 54, 59, 271 N.E.2d 649 (1971)). The court noted that in the case before it the agreement expressly stated that "[t]he acceptance of a deed by the BUYER ... shall be deemed to be a full performance and discharge of every agreement and obligation herein contained or expressed, except such as are, by the terms hereof, to be performed after the delivery of said deed," a provision that the court found to be consistent with this rule of merger. *Id.* The Supreme Judicial Court observed, however, that "[t]here is an exception to this general rule when a home builder agrees to undertake an obligation, such as constructing or repairing a building on the property, that is in addition or collateral to the conveyance of the deed." 436 Mass. at

716, 767 N.E.2d 42 (citing *McMahon v. M & D Bldrs., Inc.*, 360 Mass. at 60, 271 N.E.2d 649 (footnote omitted)).

In *Sweeney v. Deluca*, No. 042338, 2006 WL 936688 (Mass.Super.Ct.Mar.16, 2006), the Massachusetts Superior Court considered a summary judgment motion in which the plaintiffs, in response to the motion, alleged and provided evidentiary support for their contention that the defendant made oral promises relating to the integrity of the foundation of the home they acquired. Rejecting the defendant's argument that the Purchase and Sale Agreement was merged with the deed when the deed was transferred to the plaintiffs, thereby precluding a claim for breach of contract, the court stated:

> Generally, once a buyer of real property accepts a deed of conveyance of land, the contractual rights embodied in a purchase and sale agreement are discharged "except such as are embodied in the deed." An exception to this rule exists, however, for additional or collateral promises to the main promise to convey contained in a purchase and sale agreement, so long as those promises are not inconsistent with the deed.

2006 WL 936688 at *4 (citations omitted). Referring to the alleged oral promises, the court stated that they were " 'additional or collateral' to the main promise to convey contained in the Purchase and Sale Agreement. Further, these promises were not inconsistent with the deed itself. Accordingly, the Sweeneys' claim for breach of contract are not barred by the Sweeneys' acceptance of the deed." *Id.*

In this case, the Court finds that Perry's promises to deliver the Property free of lead paint and asbestos were additional and collateral to the main promise to convey and support a claim for breach of contract. Machado, however, failed to establish that his damages were caused by a

breach of those promises. Moreover, Machado did not prove by a preponderance of the evidence that the Property violated the minimum housing violations when he purchased it. Although the Property was plagued with sanitary code violations, the violations noted by Inspector Gagne on January 26, 1992 do not appear on subsequent Violation Orders, except with respect to repairs to the ceilings of the first floor apartment, which Perry testified were the result of the conduct of the second floor tenant.

■■■ In the first place, the Court finds that Machado waived any warranty that the Property was free of lead paint and asbestos because he failed to insist that Perry provide him with certificates to that effect. As noted by the court in *Micro Control Sys., Inc. v. Cadkey Corp. (In re Cadkey Corp.)*, 324 B.R. 424 (D.Mass. 2005), a waiver is "an intentional relinquishment of a known right" *Id.* at 428 (citing *Boyden v. Hill*, 198 Mass. 477, 484, 85 N.E. 413 (1908)). According to the district court, "[t]o determine whether there has been a waiver, courts look to 'all the attendant facts taken together.'" *Id.* (citation omitted). Thus, a waiver " 'may arise out of inferences from all attendant facts as well as from more express manifestations of purpose.'" *Crapser v. Bondsville Partners, Inc.*, No. 300634, 2006 WL 2237667 at *5 (citing *Suburban Land Co., Inc. v. Brown*, 237 Mass. 166, 168, 129 N.E. 291 (1921)).

The evidence presented established that Huston prepared Letters of Lead Abatement Compliance prior to Machado's acquisition of the Property, addressing the lead paint determinations made during the course of Perry's ownership. Neither Perry nor Machado testified that these letters were obtained by Machado prior to the closing. If Machado either failed to obtain certificates from Perry stating that the Property was actually free of lead paint and asbestos, certificates to which he was entitled under the Purchase and Sale Agreement, or if he relied on the letters prepared by Huston, he is estopped from claiming damages arising out of the lead paint violations found by Inspector Ann Gagne on September 22, 1993.

■■ The Court finds that sanitary code violations triggered nonpayment of rent by the tenants at 21 Shawmut Avenue. Machado, however, did not establish that the violations for which he was cited existed before he purchased the Property and he did not rebut Perry's testimony that the second floor tenant routinely permitted flooding of her bathroom by the improper use of a washing machine, thereby causing the recurring damage to the ceilings and walls in the downstairs apartment.

Machado testified that he never collected rent from the tenant occupying one of the apartments and the evidence established that the first floor apartment was unoccupied before July 29, 1993, well before the September 22, 1993 lead paint determination. Moreover, the absence of heat and numerous other sanitary code violations precipitated the vacancy in the second floor unit before Machado was required to address the lead paint determination made on September 22, 1993. The September 22, 1993 letter from the Department of Health required Machado to submit a written contract with a licensed deleader within 60 days of his receipt of the letter and to engage a lead paint inspector. Machado, however, was in default with respect to his mortgage as early as August 2, 1993, just four months after he acquired the Property and six weeks before any lead paint was found on a kitchen window sill and on the exterior of the building. Thus, the damages resulting from the foreclosure did not arise out of any lead paint violations or the presence of

asbestos in the Property but rather because of the dismal condition of the Property and the numerous sanitary code violations. Machado's own exhibit established that Perry had corrected many violations prior to his acquisition of the Property. Moreover, the only violations from Violation Order No. 18503, dated January 26, 1993, which reappeared in subsequent orders pertained to the condition of the walls and ceiling resulting from leaks or flooding from the second floor apartment.

## V. CONCLUSION

In accordance with the foregoing, the Court shall enter an order sustaining the Debtor's Objection to the Machado Claim.